JACKEY MAGEE *v.* LEONARD and REBECCA MAGEE.

1. ADVERSE POSSESSION: STATUTE OF LIMITATIONS.— A mere claim of *title*, unaccompanied by possession, gives no right of action to the party against whom it is asserted; it is the *occupation* with the *intent* to claim against the true owner which renders the entry and occupation adverse; and hence the principle on which the Statute of Limitations proceeds, is not that the party in whose favor it is invoked has set up an adverse claim for the period prescribed, but that such adverse claim is accompanied by such an invasion of the rights of the opposite party as to give him a cause of action, which having failed to prosecute within the time limited by law, he is supposed to have extinguished or surrendered.

2. SAME.—A disseizin and adverse holding is an actual, visible, and exclusive appropriation of land, commenced and continued under a claim of right,— either under an openly avowed claim, or under a constructive claim arising from the acts and circumstances attending the appropriation to hold the land against the true owner.—Angel on Lim. 410.

3. SAME.—What constitutes an adverse possession is a question of law; but the intention of the possessor, which is always material in determining questions of adverse possession, is a fact which alone can be ascertained by a jury.

4. SAME: CASE IN JUDGMENT.—When the Statute of Limitations is interposed in bar of an action for the recovery of land by the true owner, every presumption should be made in his favor; but the jury are nevertheless entitled to draw every natural presumption arising from the facts and circumstances established by the evidence. Hence, where it appeared that the ancestor of the defendant had held the undisturbed possession of the land in controversy for twenty-five years, and on his death the heirs had continued the possession for seven years before suit brought,—that he had made permanent and valuable improvements on the premises and cultivated the soil, it was *held*, that these were circumstances, which, in the absence of all proof that the plaintiff had ever asserted title, fully justified the jury in holding the possession adverse.

5. SAME.—The open, and notorious, and exclusive possession of land for a period

of twenty-five years, commencing under a parol agreement for the purchase of it, and a payment of the purchase-money, and the erection of permanent and valuable improvements, greatly exceeding in amount the unimproved value of the lands, clearly constitute an adverse holding, and vests in the occupant the absolute title.

ERROR to the Circuit Court of Marion county. Hon. John E. McNair, judge.

This was an action of ejectment, instituted by Jackey Magee, on the 20th day of September, A. D. 1855, against Leonard Magee the son, and Rebecca Magee, the widow of Fleet Magee, deceased, to recover nine and $\frac{66}{100}$ acres of land, situate in Marion county.

The defendants pleaded the general issue, and the Statute of Limitations, of seven and ten years.

On the trial, in September, 1857, the plaintiff introduced in evidence a patent to him from the U. S. (dated in 1827), for the northwest quarter of section four, township one, range twelve east, situated in the district of lands subject to entry at the land-office at Washington, in this State; and showed that the land in controversy was a small lot, situated in the said quarter section. He also proved that he entered said land from the U. S. in 1821 or 1822.

He then introduced Joseph Youngblood, who testified that the defendants were in possession of the *locus in quo* at the commencement of the suit, and had been ever since the death of Fleet Magee, which occurred in 1847; that Fleet Magee was in possession more than twenty years ago, and acted as the owner of it all the time until his death; and built stables, and planted fruit trees on it. Plaintiff here rested his case.

The defendants then introduced Daniel Smith, who testified, that Fleet Magee was in possession of the premises in controversy a great many years before his death. There is a graveyard on it, and Fleet Magee is buried there; that Fleet Magee made all the improvements on it; he built stables and a crib, and planted fruit trees on it, and exercised acts of ownership over it, as he did over his other lands. Witness assisted Fleet Magee to build the first house he built on the land, and witness afterwards lived in the house, when attending to Fleet Magee's business; that Fleet Magee

went into possession in 1823.  Witness never heard plaintiff, Jackey Magee, claim the lands.

Jesse Ball, for defendants, testified, that Fleet Magee was in possession of the premises in controversy, to witness's knowledge, thirty years ago, and continued so until his death, and his family have continued in possession ever since.  The orchard, and all the buildings on the land, were put there by Fleet Magee.  The buildings are worth from $300 to $400; and the land (unimproved), is worth about $1 25 per acre.  Witness never heard of Jackey Magee having any claim to the *locus in quo*, until a year or two ago.

Luke Connerly's deposition was next read in behalf of defendants.  He stated that, in 1821, he settled on the quarter section of land adjoining the quarter in which is situated the premises in dispute; that Jackey Magee for six years thereafter was his nearest neighbor, and Fleet Magee his nearest after Jackey; that he was intimate in both their families, and never heard, after 1823, that Jackey claimed the land in dispute: thinks if such claim had been made whilst he lived in Mississippi (he removed to Louisiana in 1848), he would have heard of it.  That about 1821, Jackey Magee entered the quarter section embracing the land in controversy from the U. S., under the law allowing such entries to be made on a credit, the purchase-money being payable by instalments.  Witness's belief is, that the land in controversy, about the year 1822 or 1823, was bargained to Fleet Magee, and from that time it has been in possession of said Fleet Magee and his descendants.  Witness does not know that any transfer was made in writing, nor the amount paid by F. Magee, but his impression is that it was $50; the amount so paid was used by Jackey Magee " in clearing the quarter section out of the (land) office."

The land in controversy lies in front of the dwelling-house in which Fleet Magee resided in his lifetime, and in which the defendants now reside.  It is separated from the yard by a lane and road, which are located on the township line.  In 1821, there was a little field, containing four or five acres, cleared on the land in controversy: this field was cultivated by Jackey Magee until 1823, but not afterwards.

Thomas Pigot's deposition was next read, in behalf of defendants.

This witness proves the location of the land in controversy, with reference to F. Magee's residence, the same as last witness; that there is a graveyard, orchard, horse-lot, corn-crib, and stables on it. He also proves that F. Magee went into possession over thirty years ago, and that since that time the possession has continued in him and these defendants till the present time. The witness further stated, that Jackey Magee (the plaintiff) told him, in presence of Fleet Magee, that the latter (F. Magee) had paid him $35 (as well as witness recollects, but he is not positive as to the amount) for the land in controversy: "that he had sold it to his brother (F. Magee) for the purpose of building a horse-lot and stables on it, and being but a small piece, was of little or no use to him, and being so near Fleet's house, would be very convenient to him."

M. Connerly, for defendants, stated that about seventeen. years ago, and soon after witness arrived in this country, he, witness, was going along the road by the land in controversy, in company with Jackey Magee, who was showing witness the "different locations," when said Jackey Magee pointed to the land in controversy and said, "This is the land I let Fleet Magee have;" and then pointing to another tract, said, "That belongs to Isaac Fortenberg."

Here the defendants rested.

Plaintiff then read in evidence the deposition of Mrs. Fortenberg, who stated, "That about fifteen years ago, as well as I can recollect, and at the time that Fleet Magee was planting out the orchard (on the land in controversy), I heard Fleet Magee and Rebecca Magee (his wife) say, that land belonged to Jackey Magee, and they ought to have got the title from him before they planted the orchard, but they had not got it. And at several other times, she heard Fleet Magee speak of that land, and that she always understood from him that it was Jackey Magee's land."

Lenford Magee, for plaintiff, testified: That he is a son of plaintiff; and that two or three years before Fleet Magee's death, that he heard him say that Jackey Magee owned the land in controversy, and that he had loaned it to him (F. Magee); and that since said Fleet Magee's death, witness heard defendant, Leonard Magee, say, that he must go down to Jackey Magee's, and get him and his wife "to sign titles to the land."

Robert Jones, for plaintiff, stated: That about fourteen years

ago he heard Fleet Magee say that he had bought the land, but had no title; that the title was still in Jackey Magee, and he must get " the titles from him."

Iven Fortenberg, for plaintiff, stated : That he was assessor of taxes of Marion county in 1854, and that Jackey Magee gave in the quarter section of land, embracing the land in controversy, as his own, but did not specify this particular tract; and that Leonard and Rebecca Magee, in giving in their land, did not include the premises in controversy.

In 1822 or 1823, there was some talk, as witness understood, of Jackey Magee's relinquishing a portion of the quarter section which embraces the *locus in quo;* that Fleet Magee was unwilling for him to do so, and Jackey Magee then concluded " to clear the whole of it out of the office, or none." The quarter section of land was always considered Jackey Magee's. The father, and mother, and the first wife of Jackey Magee, are buried in the land in controversy.

Elisha Magee, for the plaintiff: Witness is son of plaintiff; and was tax-collector of Marion county from 1843 to 1849; and was assessor of taxes from 1846 to 1849 ; Jackey Magee always, during that time, paid the taxes on the quarter section, including the land in controversy, but did not designate this particular piece ; neither Fleet Magee nor the defendants in this case, " ever gave in the land or paid taxes on it."

The defendants then introduced Fleet Magee, Jr., who stated that a short time after the death of Fleet Magee, Sr., who was his father, he was present at an interview between Jackey Magee and Leonard Magee, one of the defendants, and on that occasion Leonard Magee told Jackey Magee that he could not find the titles to the land in controversy, and that he wanted them about settling up the estate, and Jackey Magee said he would fix it up.

This was all the evidence.

The jury having found a verdict for the plaintiff, the defendants moved for a new trial: 1st. Because the verdict is against the preponderance of the testimony.   2d. Because it is contrary to law and evidence.   3d. Because the jury disregarded the instructions of the court.

The court sustained the motion, and the plaintiff excepted.

On the second trial, which took place in March, 1858, the plaintiff read in evidence the patent from the United States, which was in evidence on the first trial, and proved the possession of the *locus in quo* in defendants at the commencement of the suit. He then introduced Joseph Youngblood, who testified: that he has lived within two miles of the *locus in quo* all his life. On the 20th September, 1855, the premises were occupied by defendants; they were in possession more than three years before that time; they have been in possession for ten years; Fleet Magee, the father of defendant, Leonard, and late husband of defendant, Rebecca, was in possession, say thirty-five years ago; he occupied it a long time; while Fleet Magee was in possession, he made corn-cribs, stables, and planted an orchard on it, and made all the improvements on the place; he occupied as owner, as it seemed to witness; F. Magee continued in possession till his death; after that Leonard Magee went into possession; Rebecca has been there all the time; witness thinks the use of the land to the defendants, on account of its situation, was worth $50 per annum. It would not be worth, to another person, more than $1 50 per acre per annum.

Cross-examined.—Question. Do you mean to be understood that Fleet Magee claimed to be the owner of the land?

Answer. "I don't know anything about that; he occupied it like it was his own, and just as I would have occupied it if I had owned it."

This was all the evidence.

At the instance of plaintiff, the court instructed the jury as follows:

1st. That every possession of real estate is presumed to be in subordination to the legal title, and by the permission of the real owner.

2d. That a mere using and occupying lands, as if they were the occupant's own property, without any claim to ownership thereto being set up by the occupant, does not amount to a claim or color of right or title, and will not make such possession adverse.

3d. That no length of time will give any right or title to real estate arising from mere possession and use, unless such possession were adverse.

4th. That plaintiffs may recover rent in this action, &c.

At the instance of defendants, the court instructed the jury as follows:

1st. That if the jury believe, from the evidence, that the defendants have held continued and uninterrupted adverse possession of the premises in controversy for seven years, or more, before the commencement of this suit, they will find for them.

2d. There is no absolute and unvarying rule as to what will constitute adverse possession; but the jury have the right to decide the question upon all the circumstances in proof before them.

3d. Though the jury-may believe that the defendants were mere intruders, yet their possession, if held as owners, is protected by the Statute of Limitations, to the extent of their actual occupation.

4th. This instruction is to the effect, that the possession of F. Magee and the defendants, if. continuous and adverse, may be joined together.

The jury found a verdict for the defendants.

The plaintiff moved for a new trial, which was refused; and he excepted, and sued out this writ of error.

*W. P. Harris*, for the plaintiff in error.

The undisputed facts are, that title was in Jackey Magee, and this was uniformly admitted both by Fleet Magee and those who succeeded him in the land; that Fleet Magee never disputed the plaintiff's title, and never asserted title in himself; that Fleet Magee knew that he had no title, and admitted that the title was in Jackey Magee; that Fleet used and occupied the premises by cultivation, and for the purpose of a horse-lot, and inclosed it.

The testimony of Connerly and Pigot, therefore, is not in *support of a claim of title*. Whatever force it may have as furnishing some foundation for a claim, or as giving color to a claim of title, it is of no value in a case where the occupant has uniformly characterized his own possession as possession without title, where he has never asserted title in himself, and where he has said that the title was in another. The evidence of these witnesses shows that there might be perhaps some justice in a claim, but no claim was set up. It cannot be said that occupation and use, however long continued, will set the statute in motion, when the occupant does not dispute the title or the right of the owner.

Occupation by cultivation, building out-houses, and the like, are equivocal acts. Owners build, plant, and cultivate; tenants do the same; and the use of another's land, where proximity makes it a matter of convenience to one, and no inconvenience to another, for stables and cribs, is so common, especially where the relations are so close as they were here, that it furnishes no evidence of a decisive character on the point of intention.

Two witnesses testify to admissions by Fleet Magee, that Jackey Magee owned the land, and one, that he said that Jackey had loaned him the use of it. Two brothers ·being near each other, the use for the purpose for which this nine acres was employed by one, was not in its nature an act hostile to the title of the other. The payment of taxes by Jackey Magee, and the non-payment of them by Fleet Magee; his omission to class these acres with others on which he paid taxes, when taken in connection with the other circumstances, clearly show a possession by consent and permission. These circumstances and the testimony referred to, afforded ample ground for the verdict in favor of the plaintiff, and the court ought not to have set it aside.

The second verdict was clearly wrong. The witness said he knew nothing on the point whether Fleet Magee claimed the land: all he knew was that he built a crib and stable on it, and cultivated and used it. No evidence whatever of any claim of title, or of any equivocal act of ownership. It was possession; inclosure and building proved it to be exclusive, but nothing more. The defence of the Statute of Limitations always supposes possession. The suit could not be maintained against a person not in possession. Possession, alone, however, does not make out the defence. It must be adverse, as well as exclusive. Possession involves use, and unless there be something more than possession proved, the law presumes that it is by consent of the owner.

There must, therefore, be some evidence of adversary claim; if not founded on conveyance, evidenced by some act so *decisive* of intention to claim and to oppose the title of the owner, that it cannot be otherwise understood, it must be inconsistent with the supposition of consent.

If the evidence on the last trial shall be held to be sufficient, the word "adverse" in the statute is without meaning, and;

The instructions on the last trial were wrong in assuming that there was evidence of adverse possession.

There was no proof of claim of title, nor of color of title, and nothing tending to prove either.

The third instruction given for the defendants, when read in connection with the second instruction given for the plaintiff, asserts the doctrine that the possession of a mere intruder, if accompanied by such acts of use and occupation as owners usually employ, amounts to adverse possession, without claim or color of title, and flatly contradicts the second instruction given for the plaintiff.

It is opposed to the case of *Hanna* v. *Renfro*, 32 Miss. 125, and *Adams* v. *Guice*, 30 Miss. 397.

It is going to the very extreme of any doctrine ever advanced on this subject. Ouster means taking possession in such mode and with such intent as to substitute the party in the place of the owner, as to rights, duties, and the like, growing out of tenure, performing duties, and receiving rents, leasing, and the like; but it was never supposed that a mere intruder, without *claim* of title or color thereof, by merely inclosing a field, and planting, and erecting out-buildings, effects an ouster.

It is difficult to see how a possession can exist without some use, like the use by an owner, and to hold that use like the use of an owner, without claim or color of title, amounts to adverse possession, is to assert that " adverse" has no meaning.

The court was called on to say in reference to the facts, what was adverse possession. In one instruction it declared, in the language of this court, that claim or color of title was a necessary element, and in another that it was not. The instruction given for the defendants was erroneous, because there was no such decisive act of ownership as would indicate that the possessor defied the title of the owner, or intended to oppose it.

" Indeed, that it is the intention to claim title, which makes the possession of the holder adverse, is the doctrine upon which the decision in every case proceeds." Ang. Lim. 476, 478; Ib. 463, 464.

*John T. Lampkin*, for defendants. After setting out and commenting on the evidence introduced on the first trial, argued as follows:

In view of all the testimony, the jury had no right to arrive at any other conclusion than this: that Fleet Magee, Sr. (under whom the defendants hold), purchased from the plaintiff, and paid for the land in controversy, more than thirty years before the commencement of this suit. The only doubt that can arise, is as to whether a conveyance was ever executed. Admitting that it was not, the plaintiff is but the trustee of a satisfied trust, and will not be allowed to set up the legal title, in an action of ejectment, against the beneficiary or purchaser. *Brown* v. *Weast,* 7 How. 181.

But should a doubt arise as to the defendants' title, legal or equitable, under a purchase by Fleet Magee, Sr., from the defendant, this question of title must still be settled in favor of the defendants, upon the issue on defendants' fourth plea, to wit, ten years' adverse possession; and in order to complete this bar, our right to connect and compute the adverse possession of Fleet Magee, Sr., with that of the defendants, has not been, and will not be questioned. The only testimony tending at all to show that Fleet Magee, Sr., had no claim whatever to the premises, is that of Lenford Magee, the son of plaintiff, who states that Fleet Magee, Sr., said he regarded his possession as a mere loan. But this observation was said to have been made several years prior to his death, and he had been dead about ten years before the trial, showing conclusively that more than ten years had elapsed after the admission, before the commencement of this suit.

The only other witness whose testimony has a bearing favorable to the plaintiff on this point, is Mrs. Charles Fortenberg, who states an admission of Fleet Magee, Sr., that the legal title to the premises was in the plaintiff; but this admission was made fifteen years before the taking of her depositions.

The only other witness, to this point, for the plaintiff, is Robert Jones; but as he shows positively the paramount equitable title to be in the defendants, by virtue of a sale by the plaintiff to Fleet Magee, Sr., his testimony need hardly be mentioned as having any bearing whatever in favor of the plaintiff; yet as it was introduced by him, I will call attention to the fact that the admission of Fleet Magee, Sr., as detailed by him, was made fourteen years before the said trial.

All of this testimony fails entirely to prove any fact as occurring

within ten years prior to the commencement of the suit, that tends to disprove the adverse possession of the defendants for that time.

As to the issue made on the third plea of defendants, to wit, that the defendants had held adversely for seven years, whereby the plaintiff's right of action was barred, this plea is fully sustained by testimony, while there is not a particle of evidence introduced, or attempted to be introduced, going to show that defendants did not so hold. One witness, Lenford Magee, states that Leonard Magee, one of the defendants, said he must go down and get the plaintiff and his wife to "sign titles" to the land, evidently showing that Leonard Magee claimed the right to a conveyance, which view is borne out by the testimony of Fleet Magee, Jr., to the same point, who says, that Leonard Magee wanted the plaintiff to make the conveyance in order to enable him to settle the estate, and further stated that the plaintiff agreed to "fix it up." But all this occurred shortly after the death of Fleet Magee, Sr., and of course more than seven years before the commencement of this suit. See Hutch. Dig. 829; *Ellis* v. *Murray*, 28 Miss. R. 129, 141, 142; *Murdock* v. *Hughes*, 7 S. & M. 219; 14 Ib. 596; *Grafton* v. *Grafton*, 8 Ib. 77.

The question as to whether the defendants hold under color of title, or as mere intruders, cannot properly be raised here, because the testimony shows that the land in controversy is inclosed and occupied by them. One who has color of title is protected to the extent of the limits of his title, but the possession of a mere intruder is protected to the extent of his actual occupancy. Angell on Lim. 428; *Grafton* v. *Grafton*, 8 S. & M. 90.

The second error assigned by plaintiff is, that the court refused to sustain his motion for a new trial upon the second trial of this cause, the grounds of which motion were: 1st. Because the verdict was contrary to law and evidence. 2d. On account of improper instructions, given by the court to the jury, for the defendants.

The testimony as to the plaintiff's original title is the same as on the former trial.

George W. Rankin testifies as to the survey of the premises and the possession of the defendants, and states that the premises seem to be attached to their residence.

Joseph Youngblood testified that he has lived within two miles of

the premises all his life; that Fleet Magee, Sr. (the father of Leonard and husband of Rebecca Magee), occupied it thirty-five years ago, and that he and the defendants have possessed and occupied them ever since; that defendants had been in possession since the death of F. Magee, Sr., say ten years—Rebecca Magee had been there all the time; F. Magee, Sr., put all the improvements on the place; he occupied as owner, just as witness would have done if he had owned it.

The plaintiff here closed his testimony, and the defendants introduced none. (See plaintiff's second bill of exceptions.)

A number of instructions were given for the plaintiff, and for the defendants.

As the third assignment of errors is based upon the instructions given for the defendants, I subjoin the substance of them, and annex to each the authority on which it is founded.

1st. As to the Statute of Limitations of seven years' adverse possession. Hutch. Dig. 829.

2d. As to the right of the jury to determine whether the possession of defendants was adverse. *Grafton* v. *Grafton*, 8 S. & M. 77, and cases there cited.

3d. As to the rights of defendants to be protected by the statute, though they be mere intruders, if holding as owners. Angell on Lim. 428; *Grafton* v. *Grafton, supra.*

4th. As to the joining of the adverse possession of Fleet Magee, Sr., with that of the defendants, if necessary to complete the bar.

The possession of the defendants for more than seven years being positively proven, the last instruction was entirely unnecessary.

SMITH, C. J., delivered the opinion of the court.

This was an action brought in the Circuit Court of Marion county, by Jackey Magee against Leonard and Rebecca Magee, to recover a certain tract of land situated in said county.

The suit was instituted on the 20th of September, 1855; and the plaintiff claimed under a patent issued to him by the Government of the United States on the 10th of April, 1827. He had many years previously purchased the land by entry at the land office. The defendants based their defence to the action exclu-

sively upon the Statute of Limitations of seven years, then in force ; and upon an alleged actual adverse possession for ten years in Fleet Magee, the late husband of the defendant Rebecca, and the father of the defendant, Leonard Magee, prior to his death ; followed by the alleged actual adverse possession of the defendants down to the commencement of the action.

The cause was submitted to a jury, on these pleas, at the September term of the court in 1857, and a verdict was rendered in favor of the plaintiff. Whereupon the defendants moved for a new trial upon the ground that the verdict was contrary to law and the evidence, and because the instructions of the court were disregarded by the jury. The motion was sustained and a new trial awarded ; and the plaintiff excepted and filed his bill of exceptions, setting forth the evidence adduced on the trial.

At a subsequent term of the court, the cause was again tried, when a verdict was found for the defendants. The plaintiff then moved for a new trial, first, because the jury found contrary to law and the evidence; secondly, because erroneous instructions were granted in behalf of the defendants. The motion having been overruled, the plaintiff excepted, and has brought the case before us on writ of error.

The errors assigned relate to the action of the court on both the trials. First, it is insisted that the defendants' motion for a new trial was improperly sustained ; and secondly, that, on the last trial, the court erred in charging the jury in behalf of the defendants ; and also in overruling the plaintiff's motion for a new trial.

If the verdict rendered at the first trial was improperly set aside, it will be our duty, without examination into the subsequent proceedings, to reverse the judgment from which this writ of error is prosecuted, and to order judgment to be entered on that verdict in favor of the plaintiff in error. As first in order, therefore, we will consider the exception to the judgment on the defendants' motion for a new trial.

The subject of this controversy is a few acres of inclosed land, which were embraced by the patent to the plaintiff in error, which issued in 1827, upon an entry made by him in 1821 or 1822. A sectional or township line was the common boundary of the tract on which Fleet Magee resided, and the land covered by the patent;

Magee v. Magee.

and the premises in dispute lie very near his dwelling, being separated from the inclosure around it only by a lane. They were cultivated by the plaintiff in error before Fleet Magee went into possession, which was at least as early as 1823. There is no suggestion that either party acted under a mistake as to the true boundary of their lands. They knew from the first that the disputed premises were part of the land patented to the plaintiff in error. It was not pretended that the plaintiff in error ever made a deed conveying the land in dispute to Fleet Magee or to any other person. But it appears to be clearly proved that the latter held possession under a verbal contract for the purchase of the land ; and that he had paid the price agreed on. He entered into possession as early as 1823, and was in the open, actual use and occupation of it from that date to the time of his death, which occurred in 1847. During his occupancy he put permanent and valuable improvements upon the land. He planted an orchard, and built a corn-crib and stables upon it ; and a part of the inclosure was used as a family burying-ground. The value of these improvements exceeded, by fifteen or twenty times, the unimproved value of the land. Fleet Magee died in possession ; and the defendants in error have since that event continued uninterruptedly in possession. The plaintiff in error continued to render the whole land contained in his patent to the assessor, and to pay taxes upon it as his property. On the other hand he never pretended to set up any claim to the land until within one or two years before the suit was instituted. The land in dispute was never assessed as the property of Fleet Magee, nor did he ever pay taxes upon it.

The foregoing are all of the material facts established by the evidence on the first trial. And as it is certain that Fleet Magee did not enter or hold possession of the land under color of title, the only question which could admit of controversy was whether the possession held by him and those claiming under him, was or was not adverse.

Courts have acknowledged the difficulty, if not the impracticability, of laying down any precise rule by which, in all cases, the question of adverse possession may be determined. Disseisin and ouster mean very much the same thing as adverse possession. And it has been frequently said that an adverse possession is a posses-

sion acquired by disseisin.    But by making this assertion, the difficulty is not removed ; for a solution of the question what constitutes disseisin, is proved to be not more easy by the great amount of litigation which has arisen respecting it.

A mere claim of title, unaccompanied by adverse possession, gives no right of action to the person against whom it is asserted, and consequently, his rights are unaffected.  Hence, the principle on which the Statute of Limitations proceeds, "is not that the party in whose favor it is invoked, has set up an adverse claim for the period prescribed, but that such adverse claim is accompanied by such an invasion of the rights of the opposite party, as to give him a cause of action, which, having failed to prosecute within the time limited by law, he is supposed to have extinguished or surrendered." *Abell* v. *Harris*, 11 Gill & J. R. 371.  Doubtless it is the occupation with an *intent* to claim against the true owner, which renders the entry and possession adverse.   "A disseisin and adverse holding," says Mr. Angell, "is an actual, visible, and exclusive appropriation of land, commenced and continued under a claim of right ; either under an openly avowed claim, or. under a constructive claim, arising from the acts and circumstances attending the appropriation, to hold the land against him who was seised." · Angell on Lim. 410, sec. 11. This is, perhaps, the clearest and most comprehensive definition which can be given of the subject.

And applying it to the facts before the jury, it seems not to admit of doubt that their verdict was erroneous.

The possession and occupation of the land by Fleet Magee and the defendants in error was open, notorious, and exclusive, and continued for a period of more than twenty-five years.   It is true that he did not enter under a colorable title ; but the circumstances attending his entry and occupation of the land leave no doubt as to the character of his possession.   He entered under a parol contract for the purchase of the land, having paid the purchase price.   He erected permanent and valuable improvements upon it, greatly exceeding in amount the unimproved value of the premises ; and his occupation was open, notorious, and exclusive, and continued down to the time of his death.   These circumstances evince, beyond doubt, the character of his possession ; that it was based upon a claim of right, and consequently hostile to the title of the plaintiff in error.

And such possession having been continued for a period of time sufficient to vest in the occupant an absolute title, it follows that the verdict was erroneous, and should have been set aside.

The evidence submitted to the jury on the second trial, was much less satisfactory. The defendants offered none; and the only evidence in regard to the possession of Fleet Magee and the defendants consisted of the testimony of a single witness. That witness proved, that the defendants were in possession when the suit was commenced, and had been in possession for ten years before the date of the trial; that Leonard went into possession upon the death of his father, Fleet Magee; and that Rebecca, Fleet Magee's widow, was in possession during the occupation of the premises by her husband; that Fleet Magee was in possession thirty-five years before the time of the trial, and died in possession; that he occupied the premises a long time, and while in possession, he built corn-cribs and stables, and planted an orchard, and made all the improvements upon the land. The witness did not know that Fleet Magee set up title, or claimed to be the owner of the land. He appeared to occupy it as the owner, and just as witness would have occupied it, if he had been the owner. There was no dispute as to the fact that the premises in dispute were embraced by the patent to the plaintiff in error.

It is apparent, from this testimony and the instructions, that the only question about which there could be the least doubt, and which was, in point of fact, the only matter of contest, related to the character of Fleet Magee's possession, and that of the defendants who claimed under him. Hence, in determining the propriety of the verdict, we are limited to the single inquiry, whether the jury were not justified, by the evidence, in finding that that possession was hostile.

In legal contemplation, to constitute complete possession of land, there must be a corporeal occupation, attended with a manifest intention to hold and continue it; and when the intention is plainly to hold it against the claim of all other persons, the possession is adverse to the rights of the true owner. Such an intention may be evinced by decided acts of ownership, such as actual cultivation of the soil, the erection of valuable improvements upon the land, and the like. In thickly populated countries, such intent may be mani-

fested by less decided acts of ownership. Angell on Lim. 479, and cases cited.

Every presumption is to be made in favor of the true owner; and a bare possession is evidence of no more than the fact of present occupation by right. Hence, when it is clear that there is no intention to claim against the true owner, the possession will not be adverse, and however long continued, will not bar his right of entry. *Ricard* v. *Williams*, 7 Wheaton, 59. What constitutes adverse possession is a question of law; but as the intention of the possessor must always be considered in determining the question of adverse possession, that is a fact which alone could be ascertained by a jury; and in determining the *quo animo*, the jury must of course be governed by their own view of the effect of the evidence.

In the case before us, it is not pretended that there was any direct evidence that either Fleet Magee or the defendants in error held under an open and avowed claim of title. The claim of title or right to the fee, if, in point of fact, such claim accompanied the possession, is merely constructive, arising from the circumstances attending the occupation. And if the facts established by the evidence had been found by a special verdict, there is little room to doubt that such verdict, in legal intendment, could not be considered as establishing the fact of adverse possession.

But the jury were entitled to draw every natural presumption arising from the facts and circumstances established by the evidence. In old and thickly populated countries, "digging stones or turfs, as in England, with an occasional cutting of timber, are acts of ownership, from which a jury may infer an adverse holding;" and so almost everywhere, it is held, that actual cultivation of the soil and the erection of permanent and valuable improvements are circumstances from which the same conclusions may legitimately be drawn.

Here the possession, held by the first occupant, continued for so long a time, accompanied by unequivocal acts of ownership, his dying in possession and the entry of his heir, and the continuance of his possession for the period of seven years, in the absence of all proof that the plaintiff in error asserted title to the land, were, doubtless, circumstances from which the jury were fully justified in holding the possession adverse.

The jury were instructed, at the instance of the plaintiff in error, first, That every possession of real estate is presumed to be in subordination to the legal title, and by the permission of the real owner ; secondly, That a mere using and occupying of lands, *as if* they were the occupant's own property, without any claim to ownership thereto being set up by the occupant, does not amount to a claim or color of right or title, and will not make such possession adverse ; and thirdly, That no length of time will give any right or title to real estate, arising from mere possession and use, unless such possession was adverse. These instructions presented, fully and correctly, the law relating to the subject before the jury. It is hence gravely to be presumed that they were misled by the third instruction granted for the defendants, even if it were admitted that it laid down an incorrect rule.

By the instruction referred to, it was probably intended to be laid down, that the possession of an occupant, who holds as owner, although based on no claim of title, is protected to the extent of his actual occupation by the Statute of Limitations. And if so understood by the jury, it could not have improperly influenced their verdict.

Judgment affirmed.